UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ARMAMENT SYSTEMS AND PROCEDURES, INC.,

    Plaintiff,

v.                                                                                                                    Case No. 00-C-1257

IQ HONG KONG LIMITED, et al.,

    Defendants.

**DECISION AND ORDER**

Title 35 U.S.C. § 285 allows an award of attorney's fees in "exceptional cases." On October 12, 2007, I declared that this was such a case and ordered, with certain limitations, Armament to pay the defendants' reasonably incurred attorneys' fees as well as certain other expenses, such as those related to expert witnesses. In light of the burden this ill-begotten action has already placed on the defendants and the court, I directed the parties to attempt to reach agreement on the amount of fees that would be awarded. Agreement has not been reached, however, and from the plethora of trivial objections Armament has raised about billing matters that are "unclear," it appears consultation was scarcely attempted.

In any event, the defendants have sought a total of roughly $4 million in attorneys' fees and other expert expenses. As noted, Armament has raised a number of objections to the figures, not least of which is that it simply lacks the ability to pay anything more than $1 million. It also objects to what it describes as over-staffing on the defendants' part, "block billing," and general inefficiencies in the defense's representation. It raises further objections related to charges for the

defendants' expert witnesses as well as fees it believes were excluded by this court's October 12 order.

Before reaching Armament's particular objections, three general observations are worthwhile. First, at a telephonic hearing, the question of billing records arose, and I ordered the defendants to produce their records, subject to any privilege redactions they might wish to make at their own expense. I declined to order Armament to produce its own records, however, and it has not done so. Although I did not order their disclosure, I did note that I would draw any reasonable inferences from the fact that Armament chose not to produce its own records. The inference to be drawn, naturally, is that Armament's own fees and expenses were similar to those now sought by the defendants. Determining the reasonableness of fees is always a contextual exercise, and in a complex patent case like this one the probative value of the plaintiff's own billings is at a premium; as such, it is reasonable to conclude that Armament's failure to provide very probative evidence is highly suggestive that its own billings do not support its contention that the defendants' fees were exorbitant.

> [G]iven the complexity of this matter, the number of counsel retained by Respondent, the number of complex (as well as questionable) issues raised repeatedly by Respondent, and the lengthy process it has taken for this Court to finally reach its decision, the total number of hours spent by GM counsel on this matter are clearly not excessive. Again, Respondent has failed to identify the total number of hours his counsel have spent in this matter. Since this is such an unusual matter, this failure can only be seen, despite Respondent's protestations, as a concession that GM's counsel's total efforts actually were reasonable.

*In re General Motors Corp.,* 110 F.3d 1003, 1033 (4th Cir. 1997).

A second general observation is that this was not a typical fee generating case. Some cases begin with an expectation that one's fees could be awarded, and in such cases a moral hazard may exist and tempt attorneys to run up the tab. *Medcom Holding Co. v. Baxter Travenol Laboratories,*

2

*Inc.,* 200 F.3d 518, 521 (7th Cir. 1999). In such cases, a judge is typically not reviewing actual bills that a client has already paid; he is merely reviewing the amount of hours an attorney has worked for which he could theoretically bill the client in the event fees are *not* awarded. Because in these cases no paying client has already implicitly agreed that the fees charged were reasonable, it is especially incumbent upon the judge to act as a stand-in for the arm's length market that gives reasonableness much of its essence.

Here, however, by its nature this was an "extraordinary" case, and only in its twilight did the specter of attorneys' fees emerge. A law firm is a business, and like any business its charges must be commercially reasonable or its client base will dry up. Thus, before a bill is sent to a client, the bill is typically examined by the partner responsible for that client, who may decide to reduce some of the charges in order to keep the client happy. Sometimes attorneys may be encouraged to cut their hours in a manner not even reflected on the bill itself. Of course, once the firm's internal review process is complete, the bills are subject to the client's own review. Many clients are not shy about objecting to fees, and whether they object or not, the bill was sent with the expectation that it will not offend the client – that it is "reasonable." When a client finally pays the bill and continues to retain the law firm's services, it has already implicitly conceded the reasonableness of the fees charged.

> Courts award fees at the market rate, and the best evidence of the market value of legal services is what people pay for it. Indeed, this is not "evidence" about market value; it is market value. . . . Although Walentas denies that Balcor got its money's worth, it does not deny that these were real bills that Balcor paid and it does not argue that Balcor's lawyers ran the meter because they thought that Walentas would have to cover the tab. Corporate inside counsel monitor bills submitted by outside counsel; nothing in this record suggests that these bills received less than the usual review. They were deemed commercially reasonable and paid.

3

*Balcor Real Estate Holdings, Inc. v. Walentas-Phoenix Corp.,* 73 F.3d 150, 153 (7th Cir. 1996). And when, as here, *several* clients have paid similar bills, the assumption of reasonableness is that much stronger. In another contract-based attorneys' fee case, the Seventh Circuit made an observation that has equal weight here:

> If the bills were paid, this strongly implies that they meet market standards. The fees in dispute here are not pie-in-the-sky numbers that one litigant seeks to collect from a stranger but would never dream of paying itself. These are bills that MHC actually paid in the ordinary course of its business.

*Medcom,* 200 F.3d at 520. All of this is not to say that market forces are a complete substitute for a judge's independent review of reasonableness under § 285, but it seems instead that the need for judicial scrutiny is simply less acute when the fees sought are those that were already billed and paid in the normal course of business.

A final general observation is that the defendants were under no obligation to coordinate their defense of this case, yet in several key matters defense counsel worked together to ensure that briefs and motions were coordinated and presented efficiently. It is not uncommon in other cases for this court to be inundated with redundant briefs filed by parties whose interests are largely aligned, but this case was notable for the coordination that the defense employed to save unnecessary filings and costs. I thus have no doubt that the fees generated by the defense could have been much higher had they not worked together. With these considerations in mind, I will briefly address the plaintiff's objections.

**I. Equitable Considerations and General Objections**

Armament raises a number of specific objections to amounts sought by the defendants, and these are discussed in part II below. Several of its arguments apply across the board, however, and

4

I will address all of these at the outset. First, Armament asserts that this court should not award an amount that is more than Armament can pay, which it suggests is about $1 million. As Armament notes, an award of fees, while premised on the statutory authority found in 35 U.S.C. § 285, is at least partially an equitable undertaking. As such, in awarding fees the court should at least consider the party's ability to pay.

Yet the cases Armament relies on for this principle are primarily limited to those rare cases in which an individual plaintiff in a Title VII or civil rights case is found to be liable for the defendant's attorney's fees. Such awards are relatively rare, and given the purpose of those statutes it is not surprising that courts are leery of bankrupting individual plaintiffs and possibly dissuading others from filing meritorious lawsuits. *See, e.g., Rapisardi v. Democratic Party of Cook County,* 583 F. Supp. 539, 543 (N.D. Ill. 1984) (plaintiff unemployed for several years). Another case Armament relies on, *Anderson v. County of Montgomery,* involved a fee award under Rule 11. 111 F.3d 494, 502 (7th Cir. 1997). Such awards are sanctions and are meant only to deter similar conduct, and as such any award must be narrowly tailored to the specific amount that will accomplish that goal. *Id.*

In contrast, an award under § 285 is not meant only to deter – it is intended to compensate the defendants for their own expenses caused by the plaintiff's conduct. *Automated Business Companies, Inc. v. NEC America, Inc.,* 202 F.3d 1353, 1355 (Fed. Cir. 2000) (§ 285 is designed "to compensate the prevailing party for its monetary outlays in the prosecution or defense of the suit.") (quoting *Central Soya Co. v. Geo. A. Hormel & Co.,* 723 F.2d 1573, 1578 (Fed. Cir. 1983)). In addition, it should be obvious that a corporation bringing a lawsuit based on a fraudulently obtained patent is not entitled to the same kind of lenience as an individual citizen who loses a civil rights

5

case. Accordingly, I find no basis to reduce the fee award in this case based on Armament's claims of financial hardship.[1]

Armament also raises broad-based objections to the defendants' attorneys' travel time. Armament has not stated whether its own attorneys billed for travel time, and I may reasonably infer that they did. Regardless, it is clear that travel time is reasonably recovered as attorney's fees. Armament does not challenge the defendants' use of non-forum counsel (in fact, it chides them for using local counsel), and so its objection is not made on the basis that travel should not have been required at all. Instead, Armament opines that, in this day and age of cell phones and PDAs, an attorney never has "down" time – he is always able to bill a client for specific work and need not bill just for "travel." While that is certainly truer than ever, no one could suggest that working on an airplane or in the back of a taxi is the same as working in one's office, with secretarial and technical staff – not to mention other attorneys – present. The defendants' attorneys handled travel expenses in different ways, and in some cases Armament was the beneficiary of low or nonexistent travel bills. Absent some allegation that travel was abused (perhaps due to counsels' overwhelming zeal to visit Green Bay) I conclude that it is the attorneys' prerogative as to whether, and how, to bill their clients for travel, and that such expenses are reasonably passed on to Armament in this case.

Another general objection Armament makes is to the defendants' attorneys' use of "block billing." Again, however, Armament ignores that the bills were sufficiently detailed that those actually paying them wrote checks. (It also fails to supply the very bills that it paid – did its many

---

[1] Similarly, I reject Armament's analogy to punitive damages. And, as noted below, I do not consider it prudent to award Armament a "windfall" by denying fees merely because some fees may have been covered by insurance.

lawyers provide the level of detail it now demands?) Even so, there is no basis for a general reduction of 20% (Armament's proposal) merely because the statements are not as detailed as Armament would prefer. The same is true for Armament's proposed reductions for time spent on non-patent matters. Armament seeks a blanket percentage reduction because, in some cases, it cannot tell whether the fees sought pertained to the patent claim or not. In awarding fees only for the patent claim, I expected that non-patent expenses would be quite minimal in relation to the fees charged for the patent claim, which was the engine that drove 98% of this case. Because the defendants were overwhelmingly successful on the bulk of this case, I do not view this as the sort of "partial victory" situation in which I would expect the defendants to itemize every dime they seek and explain how it related to the patent claim. Given the character of the case, the assumption must be that the expenses *were* incurred because of the patent claim, and it makes no sense to drastically reduce their bills in a blanket fashion because some of the billing entries are not specific on that score. Counsel for the defendants have explained that they have specifically excluded several billings for ancillary non-patent matters, and I am satisfied that such is the case.

Finally, as discussed more thoroughly below, I am satisfied that the defendants' attorneys did not overbill in any systematic or pervasive way. Armament seeks blanket reductions of fees due to conferencing and overlapping staffing, but it ignores that such is the risk one takes when one sues many different defendants. Moreover, Armament fails to account for the fact that the defendants could have billed much *more* than they did had they not coordinated their efforts.

In sum, I find no basis to reduce the fee award based on either general principles of equity or general objections to certain of the defendants' counsels' billing practices. In fact, although the total amount of fees and costs requested by the defendants is substantial, the court cannot say it is unreasonable when considered in light of the motion practice that occurred in the case and the

7

amounts of money at stake, not to mention the drawn-out nature of these proceedings. The defendants have submitted a study from the American Intellectual Property Law Association, which shows that average attorney's fees in this region are roughly $1.5 million in patent cases involving up to $25 million, and $3.7 million in cases of more than that amount. Given the number of defendants in this lawsuit with significant amounts at stake, the fee request could well have been greater.

**II. Specific Objections**

Armament has cited dozens of instances in which the defendants' fees should be either reduced or eliminated. Many of these objections suffer from the plaintiff's unwillingness to offer its own fees as contrasting evidence, and others are based on abstract and sometimes contradictory principles that Armament seemingly derives merely out of its own self-interest. I address these briefly below.

### A. Fees Relating to Stroz Friedberg and Other Experts

The first eleven objections call into question more than $500,000 of fees related to experts. The fees the defendants seek related to the plaintiff's expert Emily Will will not be reduced, as this court's earlier award of $750 was not an estimate of "reasonable" attorney's fees – it was meant to minimally compensate the defendants for bringing a largely meritorious motion in the first place. The plaintiff essentially wants to use this court's "leniency" towards it as a bludgeon against the defendants, and there is no basis for such a result. (Dkt. # 336 at 2.) Similarly, there is no basis to reduce fees paid to Eric Speckin, one of the defendants' experts, or fees incurred by the defendants' attorneys in relation to Speckin. Neither the fact that the defendants did not call him at trial, nor that

8

his qualifications are objectionable to the plaintiff, justifies reducing the amounts the defendants legitimately spent to obtain the expert's advice.[2]

The plaintiff also contests several payments related to the retention of Stroz Friedberg, a forensic computer analysis firm. In particular, it challenges payments to the company for services provided by Scott Larson, an expert who proved unable to testify and whose work was, by all accounts, unreliable. It seemed that medical issues had caused the problem, and I noted that the expert's troubles were in no way caused by the defendants or their counsel. Moreover, the defendants note that Stroz Friedberg already discounted its fees by some $70,000 as a result of the problems with Larson, and this reduction has been passed on to Armament. Although no doubt there are additional expenses incurred whenever an expert has to be replaced, it seems that the $70,000 discount has accounted for much of that loss. More importantly, absent any finding of intent or fault, a single botched expert is simply part-and-parcel of the defense of a large, complex case. In other words, even though some of the fees requested would not have been incurred if everything had gone according to plan, that fact that everything did not go as planned is not uncommon in lengthy and complex litigation. To the extent the discount already factored into the Stroz Friedberg bill did not fully offset the additional fees incurred by the defendants, those fees were nevertheless *necessarily* and *reasonably* incurred in the defense's effort to deal with a problem not of their own making. The same would be true if a lawyer had died or become incapacitated, or a key exhibit lost or destroyed. Stroz Friedberg has borne the bulk of these costs itself, and it is not

---

[2] A theme that pervades Armament's objections is the premise that it need pay only those fees and expenses that were instrumental in compelling the defendants to success. Yet a fee award is much broader – the defendants are entitled to fees they incurred even when certain of their efforts may have been unsuccessful, so long as such fees are reasonably incurred in the broader defense effort.

9

unreasonable, when a fee award is made, to put the plaintiff in the shoes of the defendants in bearing the additional costs involved in adjusting to the new scenario (what Armament dismisses as "damage control"). Just as a party paying fees must generally pay for *both* winning and losing motions, for example, a party must also pay for those other unsuccessful endeavors so long as the snafus are within what can be expected in such a large case.[3] A loser in an exceptional patent case is not entitled to perfection. "Where, as here, a prevailing party 'has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation. . . .'" *Mathis v. Spears,* 857 F.2d 749, 755 (Fed. Cir. 1988) (quoting *Hensley v. Eckerhart,* 461 U.S. 424, 435 (1983)). Given that a fee award is an inherently equitable undertaking, it makes sense that the costs associated with any unintentional errors must be borne by the party ordered to pay fees.

**B. Objections Particular to Individual Defendants and Law Firms**

Armament raises 36 objections to billing entries of the individual defendants. Many of the objections are based on Armament's opinions about how the defendants' attorneys staffed their defense. It is certainly conceivable that a court would reduce a party's fee award even when the opposing party did not submit its own billing records – if fees sought appeared patently outrageous, for example, or if a deposition were staffed by six attorneys when two would clearly have sufficed. But, as noted at the outset, Armament's failure to offer its own counsel's fees into evidence is strongly suggestive that the defendants' fees are indeed reasonable. The point is not just one of fairness – the notion that one side should not be heard to complain about billing practices when it

---

[3] Armament's other quibbles do not justify fee reductions either. As with the defendants' legal staffing, it is not for Armament to second-guess how Stroz Friedberg staffs its cases. The fees charged, including those for work done by a Stroz Friedberg associate and an attorney, do not appear unreasonable.

10

fails to disclose its own billing practices – it is one of *evidence* as well. Cases, especially complex ones, are highly contextual, and what might appear exorbitant in one case could be quite reasonable in another. Thus, the best evidence available is what *others* in the same case paid their own attorneys.

I further note that my inference about Armament's own undisclosed fees is not based solely on its failure to produce its records: the docket reflects that no fewer than thirteen attorneys have appeared on Armament's behalf in this case. Typical briefs – even those of four or five pages – conclude with a Rolodex-type list of five or six attorneys, representing multiple law firms in several area codes. And, as the defendants have noted, Armament regularly appeared at depositions represented by multiple attorneys. In sum, Armament's failure to provide evidence of its own records and its own multiple-attorney staffing practices suggest that the defendants' fees are in fact reasonable.

With no competing evidence of reasonableness, I am left to review the defendants' fees for reasonableness based largely on common experience and the plaintiff's say-so. One of the plaintiff's principal objections involves the work of the law firm of Michael Best & Friedrich, a Milwaukee firm that served as local counsel for several of the defendants and lead counsel for two defendants. For example, Armament challenges defendant Emissive's payments of $202,452 in fees to Michael Best, plus $37,325 in costs such as travel expenses, because Emissive was already represented by two intellectual property partners at the Duffy Sweeney & Scott law firm. It makes a similar argument with respect to $185,555 in fees and $26,994 in expenses that defendant Vector Products made to Michael Best. Finally, it suggests that certain fees billed by a Michael Best partner, Jonathan Margolies, be cut in half because "there was surely some work that could have been completed at a lower rate by an associate." (Dkt. #459 at 28.)

11

None of these arguments suggests that the requested fees should be reduced. As Mr. Margolies has explained without rebuttal, and as this court knows first-hand, Michael Best performed far more than just "local counsel" work on this case. (Margolies Decl., ¶ 8.) Indeed, it is hard to envision clients that would pay several hundred thousand dollars' worth of fees for the limited representation Armament suggests Michael Best provided. The case Armament relies on for the proposition that more than two partners is "excessive" was a fee-generating First Amendment case staffed by a co-chair of Jenner & Block's First Amendment practice who billed out at $495 per hour despite apparently contributing mainly "local counsel" type advice on the case. *Entertainment Software Ass'n v. Blagojevich,* 2006 WL 3694851 (N.D. Ill. 2006). The analogy to a multi-defendant patent lawsuit is hardly apt, especially when the defendants have combined their defense. Armament's other objections are largely based on its flawed assertion that Michael Best was unnecessarily involved in the defense of this case, and such objections therefore fail to persuade as well.

Armament also objects to some $103,000 in fees and costs Emissive paid to Barlow Joseph & Holmes. Again, its objection is that, with two lawyers from Duffy Sweeney & Scott already working on its behalf, Emissive had no need for more lawyers from another law firm. As an example, it cites the deposition of Kevin Parsons, Armament's principal, where seven attorneys for the defendants were present and one of the Barlow lawyers did not ask a single question. Armament's objection ignores the fact that Barlow had been Emissive's patent prosecution lawyer for several years, and its expertise in the defense of this lawsuit was not redundant because the Duffy Sweeney firm had no patent prosecution lawyers of its own. Given that Armament itself staffed its case with multiple law firms, it is hard-pressed to assert any impropriety merely because

12

multiple attorneys worked on Emissive's own behalf. As Judge Crabb aptly noted in rejecting one party's challenge to the other party's choice of counsel:

> The idea that defendant is contesting plaintiff's use of a national firm is somewhat risible when one considers defendant's own conduct. It did not hire a local firm to be its lead counsel at trial. Instead, it hired a prominent firm from McLean, Virginia. For its post-trial work, it has hired lawyers from a firm in Portland, Maine. In its brief, defendant defends its choice of a national firm as merely a response to plaintiff's choice of an out-of-town firm. What more does it need to say to defeat its own argument?

*Third Wave Technologies, Inc. v. Stratagene Corp.,* 2006 WL 517629, *2 (W.D. Wis. 2006).

Armament has also raised several objections to Duffy Sweeney's bills to Emissive. It makes another unsupported assertion that Craig Scott, an IP partner at Duffy Sweeney, was working on matters that "likely" could have been done by an associate at $200 per hour. I first note that, unfortunately, it seems increasingly unlikely that any large firm IP associates bill at such rates. That aside, Armament's unsubstantiated assertion is based on its flawed assumption that the defendants were entitled to only the cheapest, most bare bones defense of their case possible. The fact is that Emissive was fully entitled to have a partner with whom it was obviously comfortable perform significant amounts of work on its case. Moreover, Armament seeks a reduction of some $44,678 merely because some entries have been partially redacted. Partial redactions do not justify denial of fees, especially when Armament could have obtained more information about the billings simply by asking. Armament also objects to certain fees which it believes may be related to "other litigation" or matters in this litigation not related to the patent claim. I am satisfied, as noted above, by the defendants' explanation that they have not sought to recover for other litigation and that fees and expenses related to non-patent claims have not been included. Finally, Armament objects to some nickel and dime issues related to deposition and witness fees, as well as a fee for an outside consultant named Kevin Bristow. I find the defendants' explanation convincing and conclude that

13

these minor expenses are fully within the amounts that should reasonably be awarded. Ultimately, without any evidence of egregious overbilling or inefficiency, I will not second-guess the fees charged by Duffey Sweeney & Scott based merely on Armament's *ipse dixit*.

Armament further objects to certain fees sought by Defendant IQ Hong Kong Limited ("IQHK"). First, it raises numerous objections to relatively small amounts it believes IQHK is improperly seeking, such as fees related to an unrelated trademark issue, an injunction motion, Rule 26 disclosures, and fees that were redacted. I am satisfied by the defendants' reply that these objections are unfounded or based on misinterpretations of the bills submitted. Moreover, the injunction motion, which was never filed, would likely have saved Armament money in the long run by discouraging *more* lawsuits based on the unenforceable patent. Its objection to $129,386 in "disbursements" fairs no better, as these reflect either reasonable attorneys' fees or other expenses directly related to this litigation.

Its principal objection to IQHK's fee request relates to $365,835 that Thomas Cunningham charged on behalf of Brooks Kushman. Armament breezily speculates that the fact that IQHK's insurance was covering the cost "may be a reason" why the bill is so high. News of an insurance company's free-spending largesse comes as a surprise to this court; equally unusual is Armament's objection to Mr. Cunningham's fees. Cunningham was an *associate* during the case and spent far more hours on it than other attorneys, which is exactly the efficient level of staffing that Armament believes it is entitled to. In sum, I do not find anything about Brooks Kushman's staffing levels or bills that warrants a reduction in fees.

Armament also levels vague objections at defendant Vector's fee request. Some of these objections, as elsewhere, reflect misunderstandings that could easily have been cleared up before briefing. Earlier I have addressed the significant contributions of Michael Best & Friedrich, and

14

there is no basis to reduce fees Vector paid to that firm. Similarly, I find no basis to reduce fees paid to the Venable law firm, as Armament's proposed reallocation of workloads (e.g., shifting work billed by a partner to an associate) does not persuade me that the fees sought are unreasonable. Armament also objects to certain fees based on the fact that Black & Decker purchased Vector in 2006; the suggestion is that Black & Decker would receive a windfall if it were awarded fees its predecessor owners paid. But the only conceivable windfall is the one that would result if Armament were let off the hook for fees merely because of the change in ownership of one of the defendants it sued. Other objections are wholly unsubstantiated. For instance, in objecting to charges by two other attorneys Armament baldly states "there was no need to have these additional attorneys work on the case," as if nothing more than its own say-so should be dispositive of the matter. (Dkt. # 459 at 27.)

The same holds true with respect to fees incurred by defendants Target and Team. The defendants have conceded what may be a possible billing error as to some $1,750, but otherwise Armament's objections are based on its assertions, which I rejected above, that Mr. Margolies should not have billed so much on behalf of Michael Best & Friedrich or that the use of two other partners (for a $3,594) was "not required."

Finally, Armament has challenged the $55,727.75 in fees sought by P&D Services, an intervening defendant. P&D intervened in the case because it had an agreement to indemnify defendant Walgreens, to which it had sold the allegedly infringing products; Armament and Walgreens filed a stipulated dismissal on October 26, 2007, settling the dispute between them. In light of its settlement with Walgreens, Armament argues that the court lacks subject matter jurisdiction over P&D because it has no further business in this case and should not be allowed to "piggyback" on the attorneys' fees issue.

15

Armament cites no authority for the principle that a court loses subject matter over an attorney's fee question once the merits of the dispute have been settled between the underlying parties. In fact, it is commonplace for courts to retain jurisdiction over attorney's fees questions even when *judgment* has been entered – it is unclear why that result would change merely because of a settlement between Walgreens and Armament.[4]

Armament also challenges P&D's fee request on the basis that P&D is merely an intervenor rather than a named defendant. It is clear that P&D's status as an intervenor is not, by itself, a bar to status as a prevailing party. *King v. Illinois State Bd. of Elections,* 410 F.3d 404, 419 (7th Cir. 2005) ("Awarding attorneys' fees to the intervenors promotes the underlying goals of the fee-shifting statutes.") The Federal Circuit has summarized the law governing attorney's fees when the party requesting a fee award is an intervenor:

> To the extent that Ixys's fee request is based on time as an intervenor, that portion of the fee request is subject to special scrutiny to ensure that hours reimbursed were not redundant or unnecessary. *Equal Employment Opportunity Comm'n v. Clear Lake Dodge,* 60 F.3d 1146, 1153-54 (5th Cir.1995). However, the mere fact that a party voluntarily intervened does not preclude an award of attorney fees. *See id.; see also Seattle Sch. Dist. No. 1 v. Washington,* 633 F.2d 1338, 1349-50 (9th Cir.1980) ("To retrospectively deny attorney's fees because an issue is not considered or because a party's participation proves unnecessary would have the effect of discouraging the intervention of what in future cases may be essential parties."); cf. *Donnell v. United States,* 682 F.2d 240, 247-48 (D.C.Cir.1982) ("If a lawsuit is successful, but the intervenor contributed little or nothing of substance in producing that outcome, then fees should not be awarded.").

*International Rectifier Corp. v. Samsung Electronics Co., Ltd.,* 424 F.3d 1235, 1241 (Fed. Cir. 2005).

---

[4] Moreover, P&D's motion for fees was filed before Walgreens and Armament filed their stipulation of dismissal.

The point is that a losing party should not be forced to pay double – fees to the original defendant as well as fees to the intervenor / indemnitor – merely because of the original defendant's approach to managing risk. On the other hand, if the indemnitor was the *de facto* party in interest and assumed a significant role in litigation, the losing party is not being asked to pay twice. In that event, in fact, the loser would receive something of a windfall if not forced to pay fees to the intervenor. Ultimately, the question here is whether the intervenor expended resources to protect it against a real risk to which it was exposed only by virtue of the plaintiff's inequitable conduct and lawsuit. In other words, if the plaintiff's conduct gave rise to the intervenor's legitimate need to intervene, and the intervenor expended significant non-redundant efforts in the action, the plaintiff should not be heard to complain that the intervention was merely "voluntary" or "duplicative."

I am satisfied that P&D's efforts in this action were a direct and reasonable response to Armament's inequitable conduct. P&D was not merely an insurer but a seller of the products at issue in this case, and it became exposed to a risk created by Armament's conduct and its decision to sue Walgreens. Armament also objects that P&D did not even attend the trial; but it is clear that Armament would also object if P&D *did* attend (its presence would be duplicative, no doubt). It is clear that P&D's relatively modest fee request was reasonably incurred in defending itself against the risk to which Armament's actions exposed it, and Armament has offered little more than vague objections to the contrary.

**III. Fee Award and Order for Judgment**

Pursuant to the stipulations on the record, this court's decision and order dismissing Armament's patent claims, as well as defendant Emissive's motion to amend and withdraw its

17

counterclaims, no further claims appear to require a ruling from this court. Accordingly, **IT IS ORDERED** that Emissive's motion [414] is **GRANTED**; P&D's motions [420] and [449] are **GRANTED**; and Armament's motion to dismiss P&D Services [424] is **DENIED**.

**IT IS FURTHER ORDERED** that judgment be entered in favor of the defendants, to the effect that the patent issued as U.S. Patent No. 6,190,018 is found unenforceable due to the inequitable conduct of plaintiff Armament Systems & Procedures; the case is found to be "exceptional" under 35 U.S.C. § 285; all other claims and counterclaims are dismissed with prejudice; and plaintiff Armament Systems & Procedures is ordered to pay the defendants the following sums:

| | |
|---|---|
| Emissive Energy: | $1,372,680.86 |
| IQHK Defendants: | $1,368,514.00 |
| Vector Products: | $ 881,195.73 |
| Team Products: | $ 291,137.55 |
| Target Corporation: | $ 290,489.07 |
| P&D Services: | $ 55,727.75 |

This judgment will terminate all further proceedings in this court in cases consolidated under the above number.

Dated this __29th__ day of February, 2008.

          s/ William C. Griesbach
          William C. Griesbach
          United States District Judge

18

Case 1:02-cv-00493-WCG   Filed 03/03/08   Page 18 of 18   Document 35